Good morning. May it please the Court, Alison Turner for the City of Westminster, who appeals the judgment on a single claim decided against it, Jose Flores' retaliation claim under FEHA. I expect to take five minutes and reserve the rest. So, all right, there's two of you here. Are you splitting your time? We are splitting our time. All right. Can you stop the clock for a second just so that I can understand that? So you're going to take five minutes? Correct. And then your colleague is going to take? I expect ten. All right. And then you'll have five minutes for rebuttal. Is that what we're talking about? And you'll decide how you're going to spend that five minutes after? Correct. All right. I'm just going to explain something to you. When you divide your time like that, a lot of times the first person gets up and talks too long. And the person seated at the table over there is trying to decide whether they should choke them and pull them off or somehow. If I allow the person to go longer, you will still have your ten minutes. It would be because I will monitor that part of it. And if I allow you to go longer, it's because we have questions that we want to ask. So you're here for Flores, right? I'm here for the City of Westminster. City. Okay. On the Flores claim for retaliation under FEHA, I just want to emphasize one point in the time that I have this morning. And that is that the test for adverse employment action under California law is narrow. The plaintiff has to show material effect on terms and conditions of employment. That is a substantial detrimental effect on the terms and conditions of his employment. It's not enough to show he might be deterred from engaging in protected conduct. It's not enough to show even that the employment action was unjustified. Officer Flores contends that there were five actions over the course of four years that amounted to a pattern of systematic retaliation for closing all avenues to special assignments and promotion and so eliminating the ability to receive pay increases associated with being sergeant. But saying doesn't make it so. His own testimony rebuts the threshold requirement that there was an adverse employment action here, even considering all the actions together. Well, let's, but, okay, when you push this rock uphill, you know, the verdict gets, they get all inferences in their favor from this standpoint. And there's things that both sides fought out pretty hard. And then the jury decides what they believe. And so when you're talking about this, I don't want you to re-argue why you should have won. You have to also consider all inferences in favor of the verdict. And so there was a lot of evidence that was before the jurors in terms of that they could have gone either way. And there were, I mean, they, on the retaliation part of it, where people filed administrative complaints or whatever, if they filed complaints, then there was a lot of evidence that the jury heard that then life of these officers then went seriously downhill. And if they, you know, blinked twice, they, you know, got written up in a log. Or if they got turned in or they got investigated under an IA. Or I think Flores had only had commendations or something and then suddenly he starts getting IAs or he starts getting complaints. And I guess he continues to get commendations from other parts of it. But if you give all inferences, tell me why the jury verdict isn't supported here. Because there was a cascade of events that the jury heard occurred after these officers complained. That's correct. But I want to take Flores' own admissions and to see when you take his own admissions, the standard of a detrimental effect on his employment doesn't hold up. Well, tell me what his admission was in front of the jury that nothing happened to him. I didn't ever see him back away from his, what's the admission that you're talking about? Excuse me. Flores admitted he didn't apply for special assignments. He admitted he did not apply to become a sergeant. He admitted his pay kept going up and was higher than those who had actually accepted special assignments. He admitted that he had more commendations than criticism or discipline after he filed his complaint. He admitted he continued to thrive, that's his word, on his job. They gave him great satisfaction. Don't you have to tell us what on this record caused the jury to go wrong? You say the jury went wrong. What caused it on this record? Frankly, I don't know what caused it with respect to Officer Flores except possibly sympathy because he doesn't meet that threshold requirement of a substantial detrimental effect. His career was not imperiled. His admissions as a matter of law. Did you argue that before the case went to the jury? I believe it was argued. I was in the trial at the time, but that was the position, that there was no adversity. Go ahead. So his career was never in jeopardy. He was put on a panel by the chief to be an advisor to the chief. His performance wasn't impaired. He got all these commendations. So I think under the California test at this threshold level, he failed to meet his burden. Okay. Let me ask you this, though. All right. He said all of those things, but correct me if I'm wrong, that, okay, in November 2010, five months after Officer Flores filed his first DFEH complaint, Chief Waller removed him from the list of available FTOs. Was that before the jury? It was before the jury. I want a yes or a no. It's mostly yes, but there's no evidence. All we know is that he didn't see himself on the list in November. Somebody may have removed him. That's correct. That's five months later. I'm asking what was before the jury, okay? I'm not asking about all these other things. In June 2011, there was an IA investigation. Officer Flores and Reserve Officer Phan received a written reprimand for failing to take reasonable action while duty. The reprimand stemmed from a domestic violence call in April of 2011 to which the officers did not respond, instead returning to the station to book evidence from a different crime scene. Although Officers Flores and Phan were closest unit to the scene of the domestic violent incident, the dispatcher sent three other cars, and Officers Flores assumed those cars were closer than he was and that he did not need to respond, and that incident involved serious injuries to the victim and perpetrator flight. Was that before the jury? That's correct. All right. Then in July 2011, Officer Flores received a supervisor's log entry, documented verbal counseling regarding a remark he made to a 14-year-old boy during a domestic violence call. The Officer Flores was working to de-escalate the situation. He instructed the boy to go inside, whereupon the boy asked, when did you become my dad? Officer Flores responded, I would not want to be your dad. The remark was deemed mean-spirited and discourteous, not necessary, and disrespectful. Was that before the jury? Correct. Then in June 2012, Officer Flores received a supervisor's log entry regarding his accidental discharge of a taser during testing. Was that before the jury? Correct. In late 2011 or early 2014, Officer Flores was interviewed as part of an IA investigation into the failure to report criminal and or policy violations and was asked whether he was surreptitiously recording coworkers or knew of anyone doing so. Correct. Okay. So all of those were before the jury and everything else that you said. So as a matter of law, if you have to concede that that was there. No question about it. Those things happened, but the issue that the jury had to decide and decided incorrectly was whether each of those things scattered over a wide period of time, by the way, whether each of those things amounted to an adverse employment action under California law, whether they substantially detrimentally. Okay. Then just give me a best case that says as a matter of law that that is not sufficient because that's what you have to present to this court. That's what I gave you with the admissions because what about compensation? Well, it continued to go up. Okay. I understand your argument then on that. I have one question before I've allowed you to go over the time because I want to, and if my colleagues have any questions. Who would be the person that I would ask between the two of you? Does the city pay punitive damages for officers in this situation or do the officers personally have to pay it? What's the law on that? I think it's a decision the city makes under certain circumstances. It isn't obligated to. It's not obligated to like it's obligated by the government code to pay compensatory damages, but my understanding is that then they can pay the punitive damages under they make certain decisions. Did the city make a decision on this? I have no knowledge of that. So I would ask the other counsel on that? Would they know? I don't know. Okay. All right. So I've given you more like ten minutes, but that's good. We wanted to ask. Do either of my colleagues have any questions? Okay. Thank you. All right, thank you. All right, so we're going to put the clock back to 15, and so he gets ten minutes. Good morning, Your Honors, and may it please the Court, Justin Sarno appearing on behalf of Andrew Hall, Ronald Koopman, and Kevin Baker. Your Honors, the first point I would like to address with the Court was the viability of the 1981 cause of action in this case and the fact that established law in the Ninth Circuit in the form of Judy v. Hamilton, a decision from 1989, forecloses the 1981 cause of action and, in fact, underscores the fact that from the inception of this case, as framed in the second amended complaint, a 1981 claim was never viable based upon the allegations that were set forth in the complaint. So did you raise that down below? Yes, we did, Your Honor. All right. Why doesn't the Supreme Court's opinion in White v. Davis hold that to some extent California civil servants' employment is contractual? White v. Davis actually underscores the fact that the 1981 claim is not viable in this case for the simple reason that White, in 2003, discussed the circumstances of a state budget impasse and whether the controller was obligated to pay the plaintiffs for a period of time when funds were unavailable to the state. And what the California Supreme Court said was these people who were working during the context of a budget impasse earned their compensation. This is something they are entitled to receive, notwithstanding any budget problems with the state. It's the same character as pension rights, which are vested. These are earned compensation rights. And this, through a lineage of California Supreme Court cases, Boren v. State Personnel Board in 1951, as well as Kern v. The City of Long Beach in 1947, and culminating ultimately in the White decision, underscored that earned compensation does have the character of a contractual obligation and entitlement for which they would be entitled to receive. Well, even if White weren't controlling, why don't the federal interests, as reflected in the amendments of Section 1981 that occurred after Judy was decided, dominate? Because actually 1981 was designed to enforce anti-discrimination in the contractual relationship. If we allow in this particular instance a lawsuit in which plaintiffs are talking about speculative, hypothetical, unearned special assignments that they think they're entitled to, but it's not fixed compensation. It's not something that they performed but weren't paid for. It's something they want. This is a desire. They want to be assigned special assignments. That's not part and parcel of a contractual relationship. So the federal interest actually is undermined if the court makes this claim cognizable under the circumstances, because the federal interest, as underscored in Domino's Pizza v. McDonald by Justice Scalia in 2006, he said we have to focus on the contractual relationship. In that particular case, McDonald wasn't a party to the contract. McDonald actually was a shareholder in a corporation that was contractually obligated with Domino's, and what the Supreme Court said was, yeah, the shareholder may have a viable stake for sure under alter ego principles and all of that, but he wasn't a party to the contract. As Scalia indicated in Domino's Pizza, Section 1981 is not an omnibus remedy for all forms of racial injustice. That's not to say plaintiffs didn't have an avenue of redress in this case. They did, Title VII, which is to enforce the spirit of the terms and conditions of employment and to ensure that anti-discrimination and anti-retaliation policies are given their due respect. But a 1981 claim was simply wrongheaded, and Judy v. Hamilton confirms that. Okay, I think unless my colleagues have any questions there, I have some that I want to ask you to make sure to get within your time, and it has to go to the punitive damages. Is the city going to pay the punitive damages if they lose? It was a political decision that was assented to by the city council, yes. The city decided to, but they were not obligated to pay for the punitive damages award. Okay. Now, so there's a whole thing here about it's Chief Waller that passed away? Correct. All right. I just have some questions about how this exactly came up because you're now claiming that you can't have punitive damages against a dead person, right? That's correct, Your Honor. All right. But he was dead before the jury went out, and you consented to the instructions and to the verdict forms, and it allowed the jury to consider that. So what's up? I understand the court's concern, and I believe that. And, I mean, I'm trying to figure out what sort of maneuvering is going on between both sides here. If everyone knew he was dead, but then no one seemed to file this notice of death, and then they tried it to the jury in a certain way, and now everyone somehow wants to unwind it, and what's up? I understand the procedural concerns completely, Your Honor, and I don't think that this is a situation in which the chiefs necessarily come to the table and say that we're procedurally absolved from any anomalies that may have occurred. I think it's an error that was borne by both sides, to be quite honest with you. Well, but you're the one that's asking relief from it right now, and if anything, you know, obviously, I think, I don't know if you practice criminal law at all, but in criminal cases, judges have more sua sponte duties. In civil cases, we leave it more to the lawyers to instruct as to the law, and so a verdict can even be wrong if the attorneys present it that way, and it's not the same injustice in a criminal case. A judge can't let that happen. Correct. Well, I think, really, the way to look at it, at least from the chief's perspective, is to look at it in the balance of the equities. I mean, we know that there is a procedure under the federal rules, Rule 25, as to what to do in the circumstance when an individual is deceased. I think in this particular case, as we've argued in the briefs, November 27, 2013 was the date of the final pretrial conference order. It was a formal order in which it was indicated unequivocally at page 237 and footnote 1 of the record that Waller was deceased. So this was a fact that was known unto everyone, and I fully concede and understand. And either side could have filed that notice to the court, and no one did, right? Well, I don't know what the notice would be if you file a death certificate or what you do or whatever. I agree, and I think it's a little bit nebulous under the circumstances. I don't know the exact mechanism either, but what I do know is that all the parties were on notice, and the pretrial conference order places all the parties on notice. So as the master of their own complaint and seeking to find redress against these individuals, I would say that the balance of the equities favors the chiefs. But if you're representing the chief and you can't get punitives against a dead person, then why would you let that go to the jury and let them assess punitive damages? It shouldn't have been a blank in the verdict form, and I agree with you. Well, so that seems like it's your invited error if you're representing the chief. I don't necessarily think so. Well, I don't think I would let my client be subject to punitives if legally he couldn't have been at that point. Well, I think, though, that speaks to the inherent foundational error of whether an award can be imputed. So we can certainly say, and I cannot dispute, that the blank was in the verdict form. But ultimately speaking, we have an award that can't be assessed against someone who's deceased. So the policy of punitive damages, which is obviously to provide an example to someone, cannot be fulfilled under the circumstances. So I fully understand the issue of invited error, and I can't really say anything other than the fact that it was on the verdict form. That's about $75,000. Yeah. But even if you let it stand because it's there, then they'd have to go back and they'd have to execute it. And I don't know how that would... A state could claim that it can't be executed against them, but the city's agreed to pay for it. So I don't know. Well, you know, this court's in a unique position, and I would say that because state law basically says, under 377.42 of the Code of Civil Procedure, that no punitive damages can be assessed against a debtor, that that really is the controlling law in the forum state. I think there's absolutely no policy objective that's going to be satisfied by honoring that verdict award under the circumstances, notwithstanding the procedural anomalies that we've all spoke about. In my remaining time, there are a few other issues. There are actually an abundance of issues. And I'll stop asking questions. Oh, no, that's okay. I like questions. But there are several other issues which I think speak to the anomalous nature of the jury verdict in this case. The first of which, and it's hard to necessarily thread together a causal connection, but I'll try and do that for you. And that is, there's a USERRA instruction that Judge Carter permitted to go to the jury in this case. At 788 of the record, you'll see that USERRA instruction, and at 234, you'll see an objection that was made to it. This wasn't a case about discrimination in the military. This wasn't a case about whether Perez was discriminated against because he was in the Marine Corps and deployed in Afghanistan during periods of time when he otherwise would have been employed by the Westminster Police Department. This is a case about whether or not special assignments were being given to Caucasians, not whether or not people who were in the military were being discriminated against. I thought what he was claiming is he didn't get notice of things. Yeah. And so what Judge Carter was doing was saying, if people are in the military, this is what an employer's duty is to people in the military. And he didn't get notice, and that, therefore, under... You're not asking for a USERRA recovery, but they were saying he should have been told that. And what the record actually reflects is that Perez was given those notifications. He just wanted those notifications to be forwarded to a private email that he would be able to receive in Afghanistan. And so the question became, what were the procedural obligations of the department under the circumstances to simply email its employees at their addresses at the Westminster Police Department to advise them of promotional opportunities? But in Perez's case, he said, well, I want them to be forwarded to a different address. So he was imposing a procedural hurdle on the department. We can debate whether or not that was reasonable under the circumstances, but it is not as if he didn't receive any notice. Okay, so did you both argue it that way to the jury? Correct. This was actually the product of an extensive colloquy with Judge Carter. He's very interested in military issues. Well, but the thing is, then, did the jury have the choice of, should you have done that or not done it, and they just decided against you? Well, I think that they were in a position where they didn't actually know what the ramifications of it were. I mean, they knew he was deployed, but I think that when faced with the USERRA instruction and then looking at the ultimate proportion of compensatories to punitives in the case of Perez, I mean, I think there's no better indicator of potential prejudice in this case than to have an instruction that has no legal significance in a case involving Title VII claims and to determine what the ramifications are of potentially discriminating against someone who's in the military. I think it created prejudice, and I think it was an abuse of discretion to allow that instruction to go to the jury. All right, unless there's any further questions, I'm going to cut you off here and give you five minutes for rebuttal. Very well. Thank you, Your Honor. Because we've already compensated that way. Thank you. Before you start, are you going to argue everything? Yes, Your Honor. Okay, so I don't need to worry about that. Okay, thank you. We'll just go through all of it, Your Honor. All right, go ahead. Good morning. My name is Oliver Dreger. May it please the Court. Good morning. And I'm here on behalf of the plaintiffs in this matter and the appellees. And with respect to the first issue brought up by the city, which essentially the argument was tailored towards the adverse employment action, I think the Court has covered that litany of issues there. And the only thing I would add to that is I think that counsel's representation of what an adverse action is was a little bit too narrow. And when you look at the facts, that sort of any real action that has any kind of substantial effect, the reduction in pay that was mentioned with respect to the field training officer removal, those issues are adverse employment actions. And clearly they could have made the jury could have and did make that inference. Well, I guess from the standpoint of how the discussion went about, I think counsel for the city on what the retaliation regarding Officer Flores, she stated what she believed to be the relevant evidence. I asked her if there were other things in the record. Was there anything else in the, I mean, of significance in the record that the jury would have heard in coming to its conclusion? I think, Your Honor, I think you did run down the list of the main points with respect to that. The core of it being the series of events there that followed in 2010 when the complaint was filed. And I think the Court ran through almost a month-by-month rundown. So I don't have anything to add on that. So I'm going to move on to the issue of the 1981, which is a little bit more of a complex issue. In that area, if there isn't really anything, well, I think counsel for the appellant city would say that Judy nips you in the bud and says it's got to be Title VII and not. I went through White and the amendments. Is there, if we were to agree with you on your argument, and I want to hear what the argument is, is this something that needs to be published? Is there anything out there in the Ninth Circuit? Well, that is an interesting point because the recent cases that have come out in recent years have done the analysis sort of afresh. So I'm not sure that there has been a definitive statement on the issue of the scope of 1981 with respect to this issue. So what is your best argument that you can maintain this under 1981? Our argument on that, Your Honor, is that the White case, that we understand the Judy rationale, the Judy test still applies, but the calculation of how that test would, the outcome of it has changed in light of two major changes that the panel had raised here with respect to the White case that came out, which is a California Supreme Court case that widened regardless of the characterizations by counsel on it. It expressly found that there are, in fact, contractual expectancies that arise to employees that are governed by a statutory scheme, where that was the exact opposite of what... The Judy case was looking at Washington law when it went to the second prong of its test, and in that case it was looking at a 1984 Washington case, which was at odds starkly with the recent White case with respect to California law. So what White did in the first step was change that there are, in fact, contractual expectancies. The breadth of White is an issue that courts have been wrangling with. The Peterson court, the district court in the Eastern District that came out with the recent case, we think that that analysis is correct in the way that the Peterson court came down on that, because the second thing that's happened since Judy was the 1991 changes to 1981, specifically the B paragraph, where now what we have is we're not only looking at 1981 rights being founded in the foundation of contracting at the initial stage, but Congress, in response to a Supreme Court case that had come out in the late 80s, had changed the statute specifically to broaden this issue and to have it delve into post-formation conduct, which is precisely what's at issue in this case here, that we're dealing with issues of the performance of the agreements, those contractual expectancies that the plaintiffs in this case had after the formation of the initial arrangement. There are expectancies with respect to promotions. There are expectancies with respect to increased pay from special assignments and other things that would advance their career. So those two changes are a stark and dramatic difference to what the Judy court was looking at in that context from 30 years ago now with two substantial changes in the law. So to summarize, Your Honor, I would say on the 1981 point that both the second and the third prongs of Judy now, the second being looking at the state issue of analyzing contract with respect to public service employment that is governed by statute, and the third prong with respect to the federal interest has changed because we also know that there is a federal interest in public employees being able to have recourse to 1981 in an employment setting, and that has expanded as a result of the 1981 amendments. So that would be my best argument, Your Honor. On the punitive damages, I'm just speaking for myself. I'm not speaking for the rest of the panel because we don't conference until after we've heard oral argument, but why should I twist my head over this issue when everyone knew that Chief Waller was dead apparently, no one and either of you could have filed the notice that was required. No one did, and then the defendants let it, then everyone let it go to the jury over punitive damages, and it seems that the law is clear. You can't get punitive damages against a dead person, right? I don't believe that that's an absolute rule. So why aren't both of you just— it just seems that everyone had some maneuvers here as trial lawyers, and now we're supposed to, you know, from whatever either of you were doing, now we're supposed to pull both of your irons out of the fire here. Well, on that point, Your Honor, I think that the weight of it goes towards what are the real grounds to change the status, what are the real grounds to disturb the determination and judgment below, and I think at that point, looking at it, there's really no reason to, and the reason why is— Let's just say this is affirmed because it's invited error or whatever. If you tried to execute this against the state, they wouldn't have to pay it, right? So you're just going to go after the city for this, or what's going— tell me what—I want to understand the world that both of you are living in here. Right, Your Honor. On that point, with respect to the probate status of the decedent's estate and with respect to the status of that, there is nothing in the record that I could point to on that point. As far as trying to fill in the blanks with what is happening, that ultimately is a point that would be resolved going forward, but it would be resolved in the forum for that, which would potentially be the probate courts of the state of California, would potentially be through some other means as far as the parties getting together on that point, but ultimately the question is, does 377.42 compel the court to disturb the ruling? And here, there can't be a clearer example of an invited error from the first point and then second. Well, so what's your—but can it be even something jurisdictional or something? If you can't get punitive damages against a dead person, is that a verdict that can be affirmed? Well, that's the thing, Your Honor, is that there isn't an absolute rule. 377.42 reads in a strong way that it would preclude that, but as we indicated in our papers of citing several cases, unfortunately this pattern doesn't fit exactly into one of them, but there were instances where someone had perished sort of in media race and the punitive damages award wasn't disturbed, even though, as counsel raised, if a person is deceased, then part of the purpose of having a punitive— In the case that you're saying that, and you're using Latin, right? Yes, Your Honor. Okay. So was that during the trial that the person died? It was after, with respect to one of the cases that we cited. It was after—it was essentially at the end of the trial, then in an in-between period where there was a lull, and then it was raised on appeal that this person— For the chief, everyone knew he was dead before you went to trial, right? Yes, Your Honor. I will— He died maybe—was it a year before the trial? I believe it was 2013 that he—I want to say early 2013, but frankly I don't recall the date of his death, Your Honor. But on this point, we also have the Whelan case that we cited to the court, which specifically talks about delay on this issue, and there has been no explanation for any sort of legal merit why a person that had perished— why counsel hadn't submitted some sort of proof of death that would have initiated Rule 25. Well, but you could have submitted that, too. It doesn't—it's not either side. But what you're saying is it wouldn't have been in your best interest because then that is less money that you can get. So I kind of understand. I'm not sure that that makes it right that you didn't— so you—but what would be their—from your perspective, what's their motivation for not doing that? Was it just they should have and they didn't? Or—and now? Frankly, Your Honor, it is baffling to me. I don't have an answer for why that wasn't done, particularly given the amount of time involved here. And it's an odd situation, but at the same time, I think ultimately we come down to it was an invited error by the defendants here of not taking care of an administrative matter that was crucial to their side on that. But now they raised it in their renewed motion for judgment as a matter of law, but not in the original motion for judgment as a matter of law. Is that right? I believe that's correct, yes, Your Honor. What, in your view, adjustments should be made by this court, if any? I don't believe that any adjustments should be made, Your Honor. I think with— I assume that's what you're arguing. And if we do that, then we have to overlook certain facts that are undisputable, wouldn't we? Well, I'm not sure what facts you'd be referring to that would compel the court— So the purpose of punitive damages can't be carried out, isn't that so? Don't we look at the purpose of punitive damages? It's certainly correct, Your Honor, that the purpose of punitive damages is a factor that can be considered by the court. But at the same time, that purpose wasn't fulfilled, and I believe it was the three cases that we cited, including the Wayland case, that particular purpose wasn't fulfilled. So it's not the only factor here, and I certainly wouldn't— I follow what you're saying, but just because other courts have erred, we shouldn't err, too. My point, Your Honor, is that it's not an error. This is an issue that was—with respect to the court's decision, if it was to leave it undisturbed, there's no basis for—there was certainly no law directly on point that that would be an error of this court. We have a very unusual situation that I'm not sure has been looked at before by the Ninth Circuit, or frankly, I'm not sure that any other circuit has looked at it, where you had a death that preceded it by such a large amount of time. But it wouldn't be quite as unjust as it might otherwise be, since both sides knew, and both sides could have brought the fact to the court's attention, and neither side did. Right, Your Honor. And I would like to say as a point here, because we haven't had occasion to necessarily delve into a lot of detail on particular facts, but the underlying fact is there was a reason why the jury came out on this with respect to Chief Waller, that there were facts presented with respect to egregious conduct by Chief Waller. Is this jury a little bit unhappy with one side? Because I think even you had to be surprised at the amount of the verdict. I wouldn't say I was surprised by it, Your Honor. There's a— I know you're extremely pleased, and maybe that's a different word, but when you look at the record— Well, we thought it was appropriate, Your Honor. There's a—you know, and we can discuss that, the years-long pattern here. But we are going to retry the case, and we don't fix—we look at legal questions, and that's what we— Correct, Your Honor. Correct, Your Honor. The jury didn't know he was dead, right? As far as I know, that did not come up other than the fact, obviously, of an empty chair. No, and the jury was there, right? An empty chair, yes, Your Honor. An empty chair, and he didn't testify. But I don't believe there was comment on that, to my recollection, Your Honor. Just so I understand, the damages against Chief Waller, there was $400,000 jointly—combined against Waller for a compensatory, correct? Roughly $395,000? I think it was $210,000 for Flores and $185,000 for Reyes? Yeah, the compensatory was roughly approaching $400,000. And you have the punitives for around $71,000, $5,000, or $72,000? Yes, Your Honor. So when we're talking about what to do with Chief Waller, there seem to be two questions. First, do we send it back in some fashion to the district court? Or we can either do what you'd like us to do, which is just to leave it as it is. We could send it back to the district court to try to figure out, under the rules, what should have happened in terms of substituting a party as to compensatory. Then there's another question as to punitives. Even if all of that was done correctly in this case, substituting the Waller as a party, then can we even award them in the first place? Would you agree that's the analysis we should be going for here? I believe that there are essentially three courses of action, and the court just outlined them. Again, I made my point on the first, Your Honor. You're clear. You're saying, go this way, don't go those two ways. Correct, Your Honor. But I think those are the options in front of the panel. If there are no further questions, then I thank the panel for your time. Thank you. Thank you, Your Honors. I have five minutes and a lot of issues to get to, so hopefully I can do them. You're only getting five because I've already given your side more than they use less. And I appreciate it. But go ahead, go for it. Two points of clarification. Chief Waller died on June 28, 2013. This trial was in February of 2014. Everyone knew he was deceased. Chief Waller's testimony was read before the jury with people all in awareness that Chief Waller had died tragically in a bicycle accident. So just to clarify those two issues, those were known to everyone. All right, but the jury's instructed. They're not told they can't give punitives against a dead person. That's correct, Your Honor. So? That's correct. Just points of clarification for you, Your Honor, so you know. I get it. The 1981 issue is critical. It's a huge issue. I'm not going to say it any other way than to inform the court that the determination of that issue would result, if accepting the Chief's argument, in the total evisceration of all damage awards compensatory and punitive against the Chiefs. And it's not an argument that's born of convenience. It's an argument on the basis of controlling Ninth Circuit law. In Judy, they determined that Washington State law, public employment in that state was held by statute. That is the exact paradigm that exists in California. We know the White decision talked about certain instances of what to do during a budget impasse, and they clarified. This is huge. Earned compensation, monies that they earned while the state was going through a budget impasse, they would be entitled to that because they earned it. This is a case, if you look at the allegations at 809 and 810 of the record, which is the second amended complaint, this lawsuit, the gravamen of this lawsuit was we desire special assignments. These are not instances of earned compensation. This is not a contractual situation for which 1981 offers redress. And if the court looks at the Barefield v. California State University of Bakersfield decision, 2006, the Northern District of California honored the Judy decision in light of White and came down with the correct decision. It's the only decision really based upon Judy that makes sense under the circumstances and comports with the legislative policy underlying 1981. Two other points, Your Honor. The reprehensibility of the conduct. I'm not going to retry the case. No one wants to retry the case. But all of the catalog of horribles that have been raised by virtue of Flores, Perez, and Reyes are to also be viewed through the same lens of what these chiefs did positively to these plaintiffs during the course of their tenure. There were countless individuals of Latino heritage who were given special assignments and promotions during the course of these individuals' employment tenure. I could go through the laundry list. Has the jury heard that? They absolutely heard it, Your Honor. And they didn't think it was a winning arrow in your quiver. And you know what? The inferences and determinations of the jury are a product of speculation as we stand here today. I can't unravel their reasoning. I don't have an understanding intellectually what they thought was more compelling or not. But what I can tell you is, as a matter of law, when we look at the proportions of compensatory to punitives, we are far in excess of standards that have been deemed acceptable by the Ninth Circuit in the United States Supreme Court. Southern Union v. Irvin, a 2009 decision, 3-to-1 ratio. What do we have here? Chief Hall vis-a-vis Plaintiff Flores, 8-to-1. There's a problem. There's a problem. Indulging all of the inferences as we made to the plaintiffs in this case, there was a proportional problem with this verdict. Do you think what you're making now is a jury argument or a legal argument? A legal argument, Your Honor. Do you think that the court should fix a percentage, a maximum percentage? The court should do it? I think the issue can be remitted to the district court with some further guidance to bring those punitive damage awards within proportions that are consistent with this court's law. Would your argument be better under the case law if it was a double digit as opposed to a single? No question. I don't disagree with that. But the Ninth Circuit has held that 3-to-1 is really an appropriate standard. In State Farm, the U.S. Supreme Court said 4-to-1. So I think we have a lot of instances in which the verdict was out of character, and I think that's an issue that can be remitted to the district court. I expect, and I don't know because we don't predict, but I expect it has to do with the conduct, and I think the conduct is going to define what the percentage ought to be. I think that's going to be the final ballgame. But I think you're satisfied that we're going to have to decide this case based on this record. Oh, I agree, Your Honor. I think it's really a point not to be lost that when you look back at the record, you will see in the tenure of each of these four chiefs commendations made to each of these plaintiffs, which were before even the filing of DFEH charges in June of 2010. You will see numerous instances. Plaintiff Flores was given step increases in pay as a result of a mall assignment. I mean, these are things that the chiefs— You need to wrap it up or answer the judge's questions if that's the case because you're going over. I'm finished. Okay. Thank you. We're done. Thank you both for your arguments, and thank you again for coming in early to accommodate the court. We appreciate it. This matter will stand submitted.
judges: Farris, Callahan, Owens